# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DANNY L. HUMMEL, JR.,**                            Case No. 1:18 CV 2550

      Plaintiff,                                      Judge Benita Y. Pearson

      v.                                             Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                            **REPORT AND RECOMMENDATION**


## INTRODUCTION

Plaintiff Danny L. Hummel, Jr. ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 5, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in December 2014, alleging a disability onset date in August 2014. (Tr. 230-40).[1] His claims were denied initially and upon reconsideration. (Tr. 141-47, 153-64). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 165-66).

---

1. Plaintiff's DIB application includes an alleged onset date of August 2, 2014 (Tr. 230); his SSI application cites August 21, 2014 (Tr. 235).

Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 25, 2017. (Tr. 35-68). On January 30, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-21). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on November 5, 2018. (Doc. 1).

## FACTUAL BACKGROUND[2]

Personal Background and Testimony

Born in 1968, Plaintiff was 46 years old on his alleged onset date, and 49 years old on the date of the ALJ's decision. *See* Tr. 230. He had a high school education (Tr. 43), and past work as a welder, plumber, delivery driver, and filter press operator, *see* Tr. 43-50, 62-63.

In an August 2015 Function Report, Plaintiff stated he could not work due to knee and shoulder injuries, depression, anxiety, and nerve damage and numbness in his hands. (Tr. 291). He reported chronic pain and anxiety disrupted his sleep. (Tr. 292). He was able to attend to personal care tasks "with difficult[y]." *Id.* He noted he could not stand for more than five minutes at a time. (Tr. 293).

At the hearing, Plaintiff testified he had knee surgery in October 2015, and that his pain had subsequently increased; he developed bone spurs and arthritis. (Tr. 39-40). Plaintiff underwent a right carpal tunnel release, *see* Tr. 39, and needed a carpal tunnel release and ulnar nerve surgery on the left (Tr. 40).

---

2. The undersigned summarizes only the evidence related to Plaintiff's arguments. Here, Plaintiff presents developed arguments (*see supra* at n.7) regarding only the ALJ's evaluation of his physical impairments. *See* Doc. 13.

Plaintiff testified that he "grew up in construction" and had "a whole lot of basically wear and tear" as a result. (Tr. 42). He could not lift, bend down, work overhead, or hold anything in his hands without pain. *Id.* He had hand pain on both sides, even after the carpal tunnel release. *Id.* ("It didn't take care of it. It relieved some of it.").

Plaintiff testified that after the right-hand carpal tunnel release, he still could not grip anything (such as a cell phone) without his hand "going numb and hurting". (Tr. 52). He could not type on a keyboard. *Id.* He described the pain as nerve pain that kept him up at night, especially on the left. *Id.* He had difficulty with pinching and tasks such as buttoning a shirt. (Tr. 52-53) ("I can't really feel the buttons, so it's kind of a whole lot of fiddling around, fumbling around, sometimes using a mirror to actually see what I'm doing because I have no feeling, especially in my left[.]"). He also described it as a constant feeling of numbness or "thousands of needles in [his] hands". (Tr. 53).

Plaintiff also described "bone on bone" problems with his right shoulder, which prevented lifting. (Tr. 54). He believed working overhead would cause shoulder dislocation; it had done so over a dozen times previously. *Id.* Plaintiff also experienced neck pain from arthritis. (Tr. 55).

Relevant Medical Evidence

In December 2014, Plaintiff saw Patrick Convery, M.D., on referral from Matthew Pawlicki, M.D. (Tr. 349-51). He reported right knee pain, left knee pain (from a past motorcycle accident), a past right shoulder dislocation (two years prior) with intermittent pain, left shoulder pain, and right cervical spine pain with numbness in his right arm. (Tr. 349). On examination, Dr. Convery noted tenderness, spasm, and pain with limited range of motion in Plaintiff's cervical spine as well as pain and tenderness in his shoulders. (Tr. 350). Plaintiff had diffuse tenderness in his lumbar spine, but a negative straight leg raise. *Id.* He had laxity in his left knee with valgus and

varus stressing, but his right knee was not tender and he had no pain with range of motion. *Id.* Dr. Convery noted x-rays showed degenerative arthritis, degenerative disc disease at C3-C4, and straightening of the normal lordotic curve "consistent with neck sprain and spasm." *Id.* Right shoulder x-rays showed degenerative arthritis and a possible Hill-Sachs lesion. *Id.* A left knee x-ray showed "some valgus of the left knee system with ligament sprain." *Id.* The left shoulder x-ray was negative. *Id.* Dr. Convery ordered left knee and right shoulder MRIs. (Tr. 350-51).

Plaintiff saw Dr. Pawlicki in March 2015, at which time he reported new onset dyspnea with minimal exertion. (Tr. 611). Dr. Pawlicki ordered various tests. (Tr. 613). In June 2015, Plaintiff returned to Dr. Pawlicki to follow up on other issues; he also reported low blood pressure episodes with lightheadedness. (Tr. 606). These records both note Plaintiff saw Dr. Convery regarding osteoarthritis, and should follow up as needed. (Tr. 609, 613).

An August 2015 MRI of Plaintiff's right shoulder showed a moderate grade partial thickness rim insertional tear of the posterior fibers of the supraspinatus tendon, low grade inferior surface partial thickness tear of the infraspinatus tendon, normal biceps tendon, slight blunting of the posterior aspect of the superior labrum, normal anterior labrum, a possible tiny para labra cyst, a mild narrowing of the hyaline cartilage of the glenoid, degenerative changes with degenerative cyst, and slight flattening of the posterior aspect of the humeral head, which might represent prior dislocation injuries. (Tr. 590-92). An MRI of the left knee taken the same day revealed small joint effusion, an irregular tear of the lateral meniscus, a complete tear of the ACL, and grade III-IV hyaline cartilage thinning. (Tr. 593-94).

In October 2015, Plaintiff underwent left knee arthroscopic surgery with Dr. Convery. (Tr. 644-46). He had an ACL reconstruction, partial left lateral meniscectomy, and debridement of degenerative arthritis. (Tr. 644). Plaintiff returned to Dr. Convery the following month, reporting

his left knee pain was markedly improved and he no longer had episodes of instability. (Tr. 660). Dr. Convery observed Plaintiff was "walking well independently without support", and without an ACL brace. *Id.*; *see* also Tr. 661 (Plaintiff was able to "get[] up out of the chair and walk[] well independently without support and without pain."). On examination, Plaintiff's left knee was stable, and he had painless range of motion. (Tr. 661).

After his surgery, Plaintiff attended physical therapy at Lake Health from November 2015 to January 2016. (Tr. 688-702, 745-47). In late December 2015, Plaintiff reported pain with prolonged walking and standing, but was able to ride his bike. (Tr. 747). In January 2016, he reported pain with walking over one mile, and some persistent instability. (Tr. 746).

In November 2015, Plaintiff underwent a neurological examination with Mark Rorick, M.D., on referral from Dr. Pawlicki. (Tr. 655). He reported numbness and pain in both arms and hands, worse on the right. *Id.* On examination, Dr. Rorick noted, *inter alia*, left elbow tenderness, an abnormal sensory examination, and an antalgic gait due to left knee pain. (Tr. 658). He opined Plaintiff likely had bilateral carpal tunnel syndrome and left ulnar neuropathy at the elbow; he recommended a nerve conduction study/EMG. (Tr. 659).

A January 2016 EMG and nerve conduction study showed severe right carpal tunnel syndrome and moderate left carpal tunnel syndrome. *See* Tr. 842; *see also* 715-16. It also showed a conduction block at the left elbow and likely bilateral ulnar neuropathies at or distal to the wrists. *See* Tr. 842.

In February 2016, Plaintiff saw Dr. Convery complaining of hand pain and numbness, as well as right shoulder pain. (Tr. 847). His left knee pain was "completely improved from preoperatively" and that he "[n]o longer ha[d] any episodes of left knee instability." (Tr. 846). On examination, Plaintiff had decreased sensation to light touch in his hands, tenderness and pain in

5

his neck, tenderness in his right shoulder, and no pain in his left shoulder. (Tr. 847). He had lumbar spine pain and a negative straight leg raising test; Plaintiff "walk[ed] well independently without pain." *Id.* Dr. Convery prescribed physical therapy for the right shoulder, and recommended a right carpal tunnel release for Plaintiff's hand pain and numbness. *Id.*

In February 2016, Plaintiff underwent a right carpal tunnel release surgery with Dr. Convery. (Tr. 760-61).

In June 2017, Dr. Convery noted Plaintiff reported that his left knee had completely improved, until it recurred after "doing a large amount of janitorial work as part of his community service." (Tr. 841). Dr. Convery observed that Plaintiff "walk[ed] well independently without support and without a left knee ACL brace on." *Id.* Plaintiff also reported left hand pain and numbness despite treatment with night splinting; he had no right hand symptoms. *Id.* On examination, Plaintiff had diffuse tenderness and pain with range of motion in his neck; his shoulders were nontender and he had no pain with range of motion. (Tr. 842). He had tenderness in his left elbow, and a "markedly positive" Tinel's sign at the left ulnar groove. *Id.* He also had some decreased sensation to light touch. *Id.* Plaintiff had diffuse tenderness in his lumbar spine, but negative straight leg raise tests. *Id.* He had some tenderness in his left knee. *Id.* Dr. Convery assessed status post ACL reconstruction, left knee pain ("unspecified chronicity"), primary osteoarthritis of the left knee, left wrist carpal tunnel syndrome, and ulnar neuropathy at the left elbow. *Id.* X-rays of Plaintiff's left knee showed spurring at the medial compartment of the left knee consistent with osteoarthritis, but were otherwise negative. *Id.* Plaintiff had a left knee cortisone injection, and Dr. Convery recommended left ulnar nerve transposition at the elbow and left carpal tunnel release. (Tr. 843).

In July 2017, Plaintiff returned to Dr. Pawlicki reporting, *inter alia*, left knee pain (with improved stability), neck pain, and right shoulder osteoarthritis pain. (Tr. 849). Plaintiff was no longer walking due to winter weather, but he "had been getting up to 3 miles since getting his knee surgery and weight off." *Id.* On examination, Dr. Pawlicki noted positive Tinel's and Phalen's testing at the bilateral wrists and negative straight leg raising. (Tr. 852). Plaintiff had full range of motion except for some limitation in his left knee, and normal muscle strength except for with left knee extension and flexion, and in hand grip; he had an antalgic gait. *Id.* Dr. Pawlicki noted Plaintiff should follow up with Dr. Convery as needed regarding his knee, shoulder, and neck pain. (Tr. 856). He also assessed carpal tunnel syndrome. *Id.*

Throughout the record, Plaintiff is noted to have a Body Mass Index above 30. *See, e.g.*, Tr. 603, 608, 658, 719, 851, 867.

*Opinion Evidence*

In July 2015, State agency physician Edmond Gardner, M.D., reviewed Plaintiff's records and opined he could occasionally lift or carry twenty pounds, and frequently lift or carry ten. (Tr. 79). He opined Plaintiff could stand or walk for about six hours in an eight-hour workday, and also sit about six hours. *Id.* Plaintiff could occasionally push or pull due to arthritis in his shoulder, and crepitus in his knees. *Id.* Dr. Gardner also limited Plaintiff to occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; he could occasionally kneel, crouch, and crawl, and was unlimited in his ability to balance or stoop. (Tr. 80). Dr. Gardner also opined Plaintiff was limited to occasionally reaching, handling, and fingering, due to his arthritis and carpal tunnel syndrome. *Id.*

In December 2015, State agency physician Stephen Sutherland, M.D., reviewed Plaintiff's records and affirmed the majority of Dr. Gardner's opinion. (Tr. 115-17). Dr. Sutherland, however, found Plaintiff could perform frequent – rather than occasional – bilateral handling and fingering.

(Tr. 116). Dr. Sutherland further limited Plaintiff to occasional stooping, frequent balancing, never climbing ladders, ropes, or scaffolds, and avoiding concentrated exposure to extreme cold, vibration, and hazards. (Tr. 116-17). Dr. Sutherland attributed the postural limitations to degenerative disc disease, osteoarthritis, and obesity. (Tr. 116).

In January 2017[3], Dr. Pawlicki completed an assessment for the Ohio Department of Job and Family Services. (Tr. 899-901). Therein, he stated Plaintiff could stand or walk four hours in an eight-hour workday, two hours without interruption. (Tr. 901). Plaintiff's ability to sit was not affected. *Id.* He opined Plaintiff could frequently carry six to ten pounds, and occasionally carry eleven to twenty pounds. *Id.* [4] He noted Plaintiff's abilities to push, pull, bend, reach, and perform repetitive foot movements were not significantly limited, and his ability to handle was moderately limited due to "weakness in hand grip [and] loss of sensation to fingers." *Id.*

In June 2017, Dr. Pawlicki completed a "Physical Medical Source Statement." (Tr. 706-09). Therein, he noted Plaintiff had diagnoses of generalized osteoarthritis, depression and anxiety, and carpal tunnel syndrome; he opined these were "chronic" and "debilitating." (Tr. 706). He noted symptoms of 7/10 pain in Plaintiff's right shoulder and neck at rest, up to 10/10 with activity, pain of 9-10/10 in the left knee even at rest, a need to change positions frequently, and neuropathic pain in Plaintiff's left arm from carpal tunnel syndrome and the ulnar nerve. *Id.* He cited a positive Tinel's sign in the left wrist, as well as decreased range of motion in Plaintiff's left knee, right shoulder, and cervical spine due to pain and muscle spasm/guarding. *Id.* Dr. Pawlicki opined Plaintiff could not walk a city block without rest or severe pain. (Tr. 707). He opined Plaintiff

---

3. Although the form was completed in January 2017, Dr. Pawlicki noted he last saw Plaintiff in September 2016. *See* Tr. 901.
4. The form defined "frequently" as "up to 2/3 of 8 hour day" and "occasionally" as "up to 1/3 of 7 [sic] hour day". (Tr. 901).

could sit for fifteen minutes before changing position, and stand for five. *Id.* Plaintiff could sit, or stand/walk less than two hours each total in an eight-hour workday. *Id.* He opined Plaintiff needed to shift positions at will, and must walk for ten minutes every fifteen minutes. *Id.* He further stated that Plaintiff would need unscheduled 30 to 60 minute breaks every two to three hours due to pain and numbness. *Id.* He stated Plaintiff should elevate his legs to ninety degrees for 50 percent of a workday due to pain. (Tr. 708). Dr. Pawlicki opined Plaintiff could rarely[5] lift less than ten pounds, and never lift a greater amount. *Id.* He could occasionally[6] twist and stoop, never crouch or squat, and rarely climb ladders or stairs. *Id.* He stated Plaintiff could use his right hand and arm for grasping, turning, twisting, and fine manipulation 50 percent of a workday; he could reach in front of his body 50 percent of the time, and never each overhead with his right arm. *Id.* He could never use his left hand to grasp, turn, twist, or perform fine manipulation; he could use his left arm to reach forward or overhead 50 percent of the time. *Id.* Dr. Pawlicki opined Plaintiff was likely to be off-task 25 percent or more of a work day, and that he was capable of low stress work; he would also likely miss more than four days of work per month. (Tr. 709).

<u>VE Testimony</u>

A VE appeared and testified at the hearing before the ALJ. (Tr. 62-67). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 63-64). The VE responded that such an individual could not perform Plaintiff's past work, but could perform jobs such as routing clerk, inspector and hand packager, and housekeeping cleaner. (Tr. 64-65). The VE also testified that an individual can be off-task for fifteen percent or less of the work day; more

---

5. The form defined "rarely" as "1% to 5% of an 8-hour working day". (Tr. 708).
6. The form defined "occasionally" as "6% to 33% of an 8-hour working day". (Tr. 708).

is work preclusive. (Tr. 65). In response to a question from Plaintiff's counsel, the VE testified that further restricting the individual to occasional reaching, handling, and fingering would preclude work. (Tr. 66). Likewise, if the person was absent from work more than one day per month on a regular basis, no work would be available. *Id.*

ALJ Decision

In her January 2018 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through June 30, 2015, and had not engaged in substantial gainful activity since the August 2, 2014 alleged onset date. (Tr. 12). She found he had severe impairments of osteoarthritis of the left knee, bilateral carpal tunnel syndrome, osteoarthritis of the right shoulder, obesity, and depression, but that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. (Tr. 12-13). The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) [with] occasional push, pulling; occasional foot controls; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs[;] occasionally stoop[,] kneel[,] crouch[,] and crawl; frequently balance; occasional bilateral overhead reaching; frequent bilateral handling and fingering; avoid concentrated exposure to extreme cold, vibration; and avoid all exposure to working in unprotected heights and operating dangerous moving equipment such as power saws and jack hammers; can perform goal oriented work that does not have a fast pace or production demands for time or quantity; can interact with others on a superficial basis defined as no arbitration and no conflict resolution; limited to work that has up to occasional changes in job duties.

(Tr. 15). The ALJ then concluded that given Plaintiff's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 20). Therefore, she found him not disabled. (Tr. 21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.     Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the RFC in this case is not supported by substantial evidence. She specifically argues this is so because 1) the ALJ failed to properly evaluate and give controlling weight to the opinion of treating physician, Dr. Pawlicki; 2) the ALJ assigned great weight to the reviewing physician opinions, but offered an RFC inconsistent with the opined limitations; 3) the ALJ's credibility determination is not supported; 4) the ALJ failed to properly consider Plaintiff's obesity, and 5) the ALJ erred at Step Five. For the reasons discussed below, the undersigned recommends the case be reversed and remanded for further consideration of the opinion evidence and subjective symptom evidence of Plaintiff's manipulative limitations.

Treating Physician: Dr. Pawlicki

Plaintiff contends the ALJ failed to adhere to the relevant regulatory requirements in evaluating the opinion of treating physician Dr. Pawlicki.[7] For the reasons discussed below, the undersigned agrees that remand is necessary.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[8] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must

---

7. Although the header of this section of Plaintiff's brief states that "The ALJ failed to properly evaluate and give controlling weight to the opinion of the treating *and examining sources* . . . ", and later states that "the ALJ's rationale for discounting the opinion of the treating *and examining physicians* was not supported by the record in this matter", he only presents a specific argument regarding the ALJ's consideration of Dr. Pawlicki's opinion. *See* Doc. 13, at 15-19 (emphasis added). Further, in his Reply, Plaintiff presents one sentence stating: "The Defendant did not address the fact that the ALJ also accorded the consultative examiner, Dr. DeCola, only little weight[]." (Doc. 17, at 2). But in neither brief does Plaintiff elaborate on any specific error in the ALJ's treatment of any examining physician. Such underdeveloped arguments are waived. *See, e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'") (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 294-94 (1st Cir. 1995) (alteration in *McPherson*)).
8. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed his claim in December 2014 and thus the previous regulations apply.

give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's brief explanation may satisfy the good reasons requirement, if that brief analysis touches on the required factors. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

The purpose of the treating physician rule is two-fold. First, the explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his

14

physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.' " *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Second, requiring an explanation "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

The ALJ explained her consideration of Dr. Pawlicki's opinion:

[L]ittle weight is given to the opinion of Dr. Matthew Pawlicki, who opined that the claimant would be capable of sitting/standing/walking for less than 2 hours in an 8-hour workday (15F/2). He further opined that the claimant would never be capable of lifting more than 10 pounds, rarely less than 10 pounds, and would be off task 25% or more during the work day. (See 15F; 21F/46). This is inconsistent with the records that note that the claimant markedly improved following his knee surgery. In fact, he stated that [] after the claimant's knee surgery, he was able to walk up to three miles (21F/1). On physical exam from October of 2015, it was noted that the claimant had full range of motion in both upper extremities (10F/30). For these reasons, this opinion is given little weight.

(Tr. 18).

The undersigned finds that the ALJ's rationale for discounting Dr. Pawlicki's sit/stand/walk limitations is supported by substantial evidence. She specifically noted that this finding was inconsistent with Plaintiff's improvement after knee surgery. (Tr. 18) (citing Tr. 849) (July 2017 – "No longer walking . . . due to winter – had been getting up to 3 miles since getting his knee surgery and weight off."). This is also supported by other evidence in the record that Plaintiff reported improvement and greater abilities following the surgery. *See* Tr. 660 (November 2015 – left knee pain "markedly improved" since surgery, no episodes of knee instability, "walking well independently without support and without a left knee ACL brace on"); Tr. 747 (December 2015 – physical therapy note that Plaintiff was able to ride his bike); Tr. 746 (January 2016 – physical therapy note that Plaintiff "continue[d] to report pain with walking >1 mile"); Tr. 846 (February 2016 – left knee pain "completely improved from preoperatively" and "[n]o longer

had[d] any episodes of left knee instability"); Tr. 784 (March 2017 – Plaintiff told therapist he walks outside when the weather is nice); Tr. 841 (June 2017 – Plaintiff reporting recurrence of left knee pain, but he "walk[ed] well independently without support and without a left knee ACL brace on"). Such inconsistency in the record is a "good reason" to discount a treating physician opinion. *See, e.g.*, *Rabbers*, 582 F.3d at 660-61. Although there are certainly records supporting greater limitations, the Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does so here, and therefore the undersigned recommends the ALJ's decision regarding Plaintiff's standing and walking limitations be affirmed.

However, the undersigned finds the ALJ failed to discuss, or provide any for discounting Dr. Pawlicki's opined reaching and manipulative restrictions. The ALJ only described Dr. Pawlicki's lifting and carrying restrictions. (Tr. 18). She did not cite his specific reaching, and manipulative restrictions. *See id.*; *see* Tr. 708 (Dr. Pawlicki's opinion that Plaintiff could use his right hand for handling and fingering 50 percent of a workday, and never use his left hand for handling and fingering; he could reach in front of his body with both arms 50 percent of a workday, reach overhead with his left arm 50 percent of a workday, and never reach overhead with his right arm). In discounting Dr. Pawlicki's upper body restrictions, the ALJ's rationale consisted of citation to a single record showing full range of motion in the upper extremities. (Tr. 18) (citing Tr. 639[9]). That record is from an October 2015 orthopedic examination prior to Plaintiff's knee surgery. *See* Tr. 637. Although the ALJ accurately cites that this record shows Plaintiff has full range of motion in both upper extremities, it also states: "[b]oth shoulders with painful [full range of motion]". (Tr. 639). The undersigned finds this single record insufficient to discount Dr.

_____

9. The ALJ cited Exhibit 10F at page "30". (Tr. 18). However, Exhibit 10F only has eighteen pages. *See* Tr. 637-53. This seems to be a typographical error and it appears the ALJ intended to cite page 3 of that exhibit, which contains the referenced findings. *See* Tr. 639.

Pawlicki's reaching restrictions, particularly where it is unclear whether the ALJ even recognized Dr. Pawlicki offered such restrictions. Moreover, the ALJ did not cite, nor provide a reason to discount, Dr. Pawlicki's opined manipulative restrictions – that is, that Plaintiff only use his right hand for handling and fingering 50 percent of a workday, and never use his left hand for handling and fingering. (Tr. 708). As noted above, "there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 552. The ALJ's lack of analysis here prevents "meaningful review of the ALJ's application of the [treating physician] rule." *Wilson*, 378 F.3d at 544.

For these reasons, and those discussed below with regard to the State agency physicians, the undersigned finds remand is required for further consideration of Plaintiff's reaching and manipulative limitations.

State Agency Physicians

Second, Plaintiff argues the ALJ erred when he assigned great weight to the opinions of the State agency reviewing physician without explaining his failure to adopt their restrictions to occasional handling and fingering. For many of the same reasons set forth above, the undersigned also finds remand necessary on this issue.

The ALJ explained his consideration of the State agency opinions:

> Great weight is given to Disability Determination Services consultants Dr. Stephan Sutherland and Edmond Gardner, to the extent that it is consistent with the claimant'[s] residual functional capacity. They opined that the claimant would be capable of a less than light exertional level, limited to occasional reaching/handling/fingering due to arthritis, and limited overhead reaching (See 4A and 8A). The claimant stated that after his knee surgery, he was able to walk up to three miles (21F/1). On physical exam from October of 2015, it was noted that the claimant had full range of motion in both upper extremities (10F/30). For these reasons, and the rest of the medical file, these opinions are given great weight.

(Tr. 19).

17

The RFC determination is one reserved to the Commissioner, and it need not correspond to any particular medical opinion. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). And an ALJ need not provide good reasons for the weight assigned to a non-treating physician opinion. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[T]he SSA requires ALJs to give reasons for only treating sources."). However, the RFC determination, like all other findings by the ALJ, must be supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Walters*, 127 F.3d at 528. And the ALJ must provide enough explanation so this Court can trace the path of her reasoning. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) ("[T]he ALJ's decision still must say enough 'to allow the appellate court to trace the path of his reasoning.'") (quoting *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)).

The ALJ's analysis of Drs. Sutherland and Gardner's opinions, and indeed her opinion as a whole, fails to explain the basis of her finding that Plaintiff can perform "frequent bilateral handling and fingering". (Tr. 15). The ALJ summarized the two State agency opinions as both limiting Plaintiff to "occasional reaching/handling/fingering due to arthritis." (Tr. 19). Preliminarily, although neither party points it out – the undersigned notes that this is an incorrect description of the record. Dr. Gardner offered the cited opinions, *see* Tr. 80, but Dr. Sutherland opined Plaintiff could occasionally reach, and *frequently* handle and finger, *see* Tr. 116. This error

18

aside, from the ALJ's decision, it appears she believed both opinions limited Plaintiff to occasional handling and fingering. *See* Tr. 19. And, as noted above, the only other opinion evidence of record – from Dr. Pawlicki – also assigned greater limitations on Plaintiff's manipulative abilities which the ALJ did not discuss. *See* Tr. 708 (opining Plaintiff could use his right hand for handling and fingering 50 percent of a workday, and never use his left hand for handling and fingering). Yet, nowhere in the ALJ's decision did she explain the rationale behind finding Plaintiff was capable of frequent bilateral handling and fingering, or conversely, a rationale for discounting the opinion evidence that was more limiting. The Commissioner points to Plaintiff's "successful right carpal tunnel release surgery in 2016 that eliminated Plaintiff's numbness, tingling, and pain by 2017". (Doc. 16, at 10). Although the ALJ discussed Plaintiff's June 2017 report that he had no right-hand symptoms, but was still symptomatic on his left hand (Tr. 17) (citing Tr. 841-42), she made no attempt – as the Commissioner does in the brief before this Court – to connect these findings to the RFC or her analysis of the opinion evidence. Thus, any attempt to do so by this Court would amount to improper *post hoc* reasoning. *Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency). Moreover, even this explanation does nothing to explain her consideration of Plaintiff's left-hand symptoms. The ALJ cites the same, single October 2015 treatment note showing full range of motion in the upper extremities. (Tr. 19) (citing Tr. 639). For the same reasons discussed above, this is insufficient.

This failure of explanation is harmful error because when asked to add a further limitation to occasional reaching, handling, and fingering, the VE testified that no jobs would be available. *See* Tr. 66. The undersigned finds ALJ's decision fails to "say enough 'to allow the appellate court

to trace the path of [her] reasoning'" regarding Plaintiff's manipulative limitations. *Stacey*, 451 F. App'x at 619 (quoting *Diaz*, 55 F.3d at 307). Remand is thus required for further evaluation of the State agency opinion evidence as it relates to Plaintiff's reaching, handling, and fingering limitations.

Subjective Symptoms / Credibility

Third, Plaintiff argues the ALJ erred in her credibility / subjective symptom evaluation. He contends the ALJ "used generalities rather than specifics related to Plaintiff and his impairments." (Doc. 13, at 22). For the reasons discussed below, the undersigned finds remand is also required for the ALJ to address Plaintiff's subjective hand symptoms.

The Sixth Circuit has recognized that pain alone may be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800–01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

When a claimant alleges impairment-related symptoms, an ALJ must follow a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304, *2-

8.[10] First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7-8. Those factors include: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). The ALJ must "consider" the listed factors, but need not discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

---

10. SSR 16-3p replaced SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. It directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms" and removes the term "credibility". *Id.* at *1. Both rulings, however, refer to the same two-step process articulated in 20 C.F.R. § 404.1529 and the same factors to consider. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (noting that the updated ruling was to "clarify that the subjective symptoms evaluation is not an examination of an individual's character.") (internal quotation omitted). Thus, "[w]hile the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where the usage of the term is most logical." *Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio ), *report and recommendation adopted*, 2018 WL 309369.

The Sixth Circuit has explained (interpreting SSR 96-7p, the precursor ruling), that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such determinations are "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]."). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Here, the ALJ summarized Plaintiff's testimony, set forth the two-step process, and then explained:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are generally inconsistent with the record. The medical evidence of record does support some limitations in both the mental and physical functioning of the claimant, but not to the level described. The evidence supports a finding that the claimant would be capable of a less than light exertional level, with additional mental limitations. However, the claimant would still be able to work at substantial gainful activity levels.

(Tr. 16). In her introduction to the summary of Plaintiff's physical health records, the ALJ also stated: "The claimant's allegations regarding his physical symptoms are generally inconsistent with the medical evidence of record." *Id.* Thereafter, within her description of the records, the ALJ

noted Plaintiff's subjective report of pain improvement after knee surgery (Tr. 17) (citing Tr. 660), as well as his later report of recurrence (Tr. 17) (citing Tr. 841). The ALJ further cited a later x-ray showing spurring and osteoarthritis. (Tr. 18) (citing Tr. 842). She also noted Plaintiff's report that at one point he was walking up to three miles after surgery (Tr. 18) (citing Tr. 849), and that he told a therapist in February 2016 that he walked outside when the weather is nice (Tr. 18) (citing Tr. 784). The undersigned finds that these are substantially supported reasons to discount Plaintiff's subjective report that he was, *inter alia*, only able to walk five minutes before needing a ten-minute break. *See* Tr. 16 (citing Tr. 296). That is, they are sufficient for this "subsequent reviewer [to] assess how the adjudicator evaluated the individual's symptoms", SSR 16-3p, 2017 WL 5180304, at *10, with respect to Plaintiff's abilities to stand and walk.

However, although the ALJ summarized Plaintiff's testimony that he "cannot hold a cell phone without being in pain . . . cannot hold anything, cannot type on a keyboard, and still experiences severe pain" (Tr. 16) (citing Tr. 42, 52-53), as discussed above, her opinion contains no reasoned explanation for discounting these subjectively-reported, and opinion-evidence supported manipulative restrictions. Thus, on remand, the ALJ should also provide further explanation regarding her consideration of these symptoms.

<u>Obesity</u>

Next, Plaintiff argues the ALJ erred in her consideration of Plaintiff's obesity and its effect on Plaintiff's ability to work.

Obesity is defined as "a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281, at *2. When establishing the existence of obesity, the ALJ will "rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* at *3. Although obesity is no longer

23

considered a listed impairment, it is considered a medical impairment, so it must be considered at each step of the ALJ's analysis. *Id.* at *1; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016). This is because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2002 WL 34686281, at *1. Specifically, the ALJ must consider "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment" and an individual's ability to sustain a function over time when formulating the RFC. *Id.* at *6.

However, the "ALJ is not required to use any 'particular mode of analysis' in assessing the effect of obesity." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)). "[T]he ALJ does not need to make specific mention of obesity if [s]he credits an expert's report that considers obesity." *Bledsoe*, 165 F. App'x at 412. If all of the evidence the ALJ relies on considers the claimant's obesity, then the ALJ will have satisfied the regulations. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity."); *Caldwell v. Berryhill*, 2017 WL 957538, at *6 (E.D. Ky.) (upholding ALJ's decision, in part, because Plaintiff did not identify any additional limitations that should have been incorporated into the and ALJ considered medical evidence that took obesity into consideration).

Here, the ALJ explicitly considered Plaintiff's obesity, stating:

In this case, the claimant's BMI contained in office notes consistently measured the claimant's BMI at or above 30 which is considered obesity per SSR 02-1p (See 9F/7, 16; 17F/2; 21F/3, 18). It can reasonably be concluded that the claimant's

obesity could be expected to exacerbate his knee and shoulder pain, causing serious physical limitations.

(Tr. 18).

The undersigned finds no error. It is clear that the ALJ considered Plaintiff's obesity, as required by SSR 02-1p. And, the ALJ's RFC contained significant restrictions on Plaintiff's abilities to lift, push, pull, use foot controls, climb ramps and stairs, perform postural maneuvers, and balance. *See* Tr. 15. Moreover, Plaintiff has not identified any further limitations that he contends his obesity causes, other than to say it would have some effect "on his ability to sustain the standing and walking required for work at the light level of exertion." (Doc. 13, at 23). This is insufficient. As another district court within this Circuit summarized:

> An ALJ does not commit reversible error in failing to address the claimant's obesity where the claimant fails to present evidence of the impairment. *O'Neill v. Colvin*, No. 1:13 CV 867, 2014 WL 3510982, at *12 (N.D. Ohio July 9, 2014). For example, in *Smith v. Astrue*, the court noted that "[w]hile Plaintiff calls this Court's attention to documents in the record showing her height and weight, which appear to meet the definition of obesity, Plaintiff did not present any evidence to the ALJ that her obesity impacted her ability to work." No. 3:10CV1829, 2012 WL 1232272, at *4 (N.D. Ohio Apr. 12, 2012). Moreover, "Plaintiff did not testify about her obesity, did not list obesity as an impairment in her disability report, and the medical evidence that she submitted did not establish that her obesity impacted her ability to work or how it impacted her ability to work." *Id.* at *5. Accordingly, the court found that the "ALJ did not error by failing to address Plaintiff's obesity." *Id.*; *see also Benson v. Astrue*, No. 1:10CV1654, 2011 WL 6122944, at *9 (N.D. Ohio Nov. 15, 2011) (ALJ did not err in failing to address obesity when claimant "relies on the fact that there is a notation of [claimant's] height and weight in her treating physician's medical notes, and that the consultative examiner noted [claimant's] height and weight and stated [claimant] appeared to be an obese lady."); *O'Neill v. Colvin*, No. 1:13 CV 867, 2014 WL 3510982, at *11 (N.D. Ohio July 9, 2014) (collecting cases).

*Puckett v. Comm'r of Soc. Sec.*, 2019 WL 3752922, at *4 (E.D. Ky.)

Finally, as the Commissioner points out (Doc. 16, at 7-8), the ALJ relied on opinions which took Plaintiff's obesity into account. *See, e.g.*, Tr. 19 (assigning great weight to the opinion of Dr. Sutherland); Tr. 113-16 (Dr. Sutherland's determination that obesity is a severe impairment, and

assignment of postural limitations due to obesity). This is sufficient. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010) ("Every medical opinion that the ALJ evaluated acknowledged Coldiron's obesity. Thus, by utilizing the opinions of these physicians in fashioning Coldiron's RFC, the ALJ incorporated the effect that obesity has on the claimant's ability to work into the RFC he constructed.") (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight would make it more difficult to stand and walk. Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.")). For these reasons, the undersigned finds no error in the ALJ's consideration of Plaintiff's obesity.

Step Five

The undersigned declines to address Plaintiff's argument that the ALJ erred at Step Five because, as stated above, remand is required for further consideration at Step Four.

Request to Remand to Different ALJ

Finally, Plaintiff requests, without elaboration, "remand to a different ALJ[.]" (Doc. 13, at 24). The Seventh Circuit has explained that a district court exceeds its authority in directing that a case be remanded to a new ALJ in the absence of evidence of bias. *See Travis v. Sullivan*, 985 F.2d 919, 924 (7th Cir. 1993). And district courts within the Sixth Circuit have similarly held that remanding to a new ALJ is not necessary absent demonstrated bias. *See, e.g.*, *Price v. Colvin*, 2016 WL 5239837, at *8 (W.D. Tenn.). "Shortcomings in the evaluation of a claim do not in and of themselves equal bias, nor does an ALJ's expression of doubts regarding a claimant's credibility based on the objective administrative record." *Hunley v. Astrue*, 2011 WL 3566803, at *4 (E.D.

Tenn.). Because Plaintiff has presented no such argument or evidence, the undersigned recommends this request be denied.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial evidence and recommends the decision be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g).


           s/James R. Knepp II
           United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).